UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------------ x
ROBERT TAITAGUE,                                  :
                                                  :
                        Plaintiff,                :
                                                  :
        v.                                        :        23-CV-626 (SFR)
                                                  :
CITY OF NEW LONDON,                               :
                                                  :
                        Defendant.                :
------------------------------------------------------------------ x

**MEMORANDUM & ORDER**

Plaintiff Robert Taitague sued his former employer, the City of New London ("Defendant," or "the City"), after he was terminated during the probationary period of his employment in the City's Department of Public Works. Taitague asserts that the City discharged him on account of his race in violation of Connecticut and federal law. After the close of discovery, the City moved for summary judgment. For the reasons that follow, I grant the City's motion for summary judgment.

**I.    BACKGROUND**

   **A.    Factual Background**

The following factual background is taken from the parties' Local Rule 56 statements,[1]

---

[1] Local Rule 56(a)1 provides: "Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact." Local Rule 56(a)3 provides, in relevant part: "Each statement of material fact by a movant in a Local Rule 56(a)1 Statement or by an opponent in a Local Rule 56(a)2 Statement, and each denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." It states that the "[f]ailure to provide specific citations to evidence in the

declarations and deposition transcripts submitted by the parties, and the underlying evidentiary record.[2]

### 1. Taitague's Duties as Transfer Station Maintainer

Taitague applied in the fall of 2021 for a position as a Transfer Station Maintainer in the City's Department of Public Works. Pl.'s Resp. to Def.'s L.R. 56(a)1 Statement of Undisputed Material Facts ("Pl.'s L.R. 56(a)2 St.") ¶ 6, ECF No. 30.[3] The position was open only to applicants who possessed a Commercial Driver's License (CDL), *id.* ¶ 7, and had demonstrated the "ability to safely operate all heavy mechanical and motorized equipment in the division, in all weather," *id.* ¶ 8. The duties of a Transfer Station Maintainer include operating heavy trucks to transport solid waste and recyclables to designated sites in New London and around the state. *Id.* ¶ 19-20. A successful Transfer Station Maintainer must demonstrate "experience, skill and confidence" operating heavy trucks. *Id.* ¶¶ 20-21.

Taitague is a Black man. *Id.* ¶ 1. At the time he applied for the position, Taitague had recently received a CDL and completed a driving course. *Id.* ¶¶ 9-10. Taitague had not operated large trucks beyond the experience he gained completing a driving course. *Id.* ¶ 10. In addition to Taitague, the City interviewed at least one other candidate, a white man, who was well qualified for the Transfer Station Maintainer position. *Id.* ¶ 14. Taitague was interviewed by a committee of three City officials: Brian Sears, the Director of Public Works; David DeNoia,

---

record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1." *Id.*

[2] The page numbers cited to in this ruling regarding any documents that have been electronically filed refer to the page numbers imprinted by the electronic case filing system on the header of the documents and not to the page numbers of the original documents, if any.

[3] When Taitague admits a fact stated in the City's Local Rule 56(a)1 Statement, I cite only to Taitague's Local Rule 56(a)2 Statement admitting that fact as true.

Superintendent of Public Works; and Quincy Jones, crew lead for the Waste Management Division. *Id.* ¶ 11. Sear and DeNoia are white; Jones is Black. *Id.* ¶¶ 12-13.

The City hired Taitague over the other candidate because Taitague was a long-time resident of New London and the other candidate was not. *Id.* ¶ 16. Taitague's position began on November 1, 2021. *Id.* ¶ 18.

### 2. The City's Union Contract and Employment Policies

Employees of the Department of Public Works are covered by a collective bargaining agreement (CBA). *Id.* ¶ 22. Pursuant to the CBA, Taitague was hired on a probationary basis. *Id.* ¶ 35.[4] Taitague's probationary period was set to last for 180 days; a permanent offer of employment was contingent upon satisfactory performance during the probationary period. *Id.* ¶¶ 34-36.

Although the City contends that probationary employees were exempt from the City's published Personnel policies, Taitague asserts that the City's Personnel and Administrative Policies, Rules, and Procedures applied to probationary employees. ECF No. 31-2, at 43.[5] The policies describe probation as "an integral part of the examination and appointment process [that] shall be utilized for closely observing the employee's work, for securing the most effective adjustment of a new employee to his/her position and for disqualifying any employee whose performance or conduct is not completely satisfactory." *Id.* at 43. The policies require supervisors to document a probationary employee's performance at designated intervals

---

[4] The CBA in effect from 2018 to 2022 is included in full as an exhibit to Defendant's Motion for Summary Judgment. ECF No. 28-11.

[5] Defendant attached the relevant portions of the Personnel Policies to their submission. ECF No. 28-13. Taitague attached the Policies in full. ECF No. 31-2.

3

throughout the probationary period, *id.*, and to describe any cause for concern with the employee, *id.* at 44. Subject to the "concurrence of the Personnel Coordinator and supportive documentation," probationary employees may be removed if:

> a. the employee is unwilling or unable to satisfactorily perform the duties of the position or
>
> b. the employee displays poor work habits or a lack of dependability that have not improved significantly or are such that the employee does not merit continuance or
>
> c. the employee has committed an offense which is considered cause for disciplinary action.

*Id.* at 44.

### 3. Taitague's Performance

Taitague was supervised by Quincy Jones throughout his probationary period. Pl.'s L.R. 56(a)2 St. ¶ 37. Jones was responsible for assigning responsibilities at the Solid Waste Division's worksite. *Id.* ¶ 62. Jones had multiple opportunities to evaluate Taitague, including by riding in the cabin of Taitague's truck during the early days of Taitague's employment. *Id.* ¶ 44. Jones observed that Taitague "displayed uncertainty and a lack of confidence when operating heavy trucks." *Id.* ¶ 37. In one instance, Taitague damaged the hydraulic lines of a trailer after forgetting to disconnect the lines that connected the trailer to the truck. *Id.* ¶ 46. Taitague was not disciplined for this error. *Id.* ¶ 47. Jones shared his concerns regarding Taitague's performance and lack of confidence with his supervisor, Sear. *Id.* ¶¶ 38-39. Sear also received reports from DeNoia and from Wayne Burroughs, the Head Mechanic, regarding Taitague's performance. *Id.* ¶¶ 41, 83. Sear in turn directed Jones and DeNoia to support Taitague as he adjusted to the requirements of his position. *Id.* ¶ 43. Jones had at least one

conversation with Taitague about Jones' observations of Taitague's lack of confidence operating heavy trucks. *Id.* ¶¶ 45, 82.

In March of 2022, Sear asked Jones whether he believed Taitague should be retained. ECF No. 28-8, ¶ 9. Jones recommended that Taitague not be offered a permanent position as a Transfer Station Maintainer. Pl.'s L.R. 56(a)2 St. ¶¶ 48-49. Jones believed that Taitague was unsuited for the position because he displayed a lack of confidence operating heavy trucks. *Id.* ¶ 49.[6] On the basis of Jones' assessment and recommendation, Sear, in consultation with the City's Personnel Director, decided to terminate Taitague before the end of his probationary period. *Id.* ¶¶ 53, 55. Taitague was notified on March 25, 2022 that he was being terminated "based upon an evaluation of your work performance." *Id.* ¶ 57.

Sear testified at his deposition that Taitague was replaced by Abel Guzman. ECF No. 28-6, at 24. Sear confirmed that Guzman is not Black. *Id.* at 23.

During the time that he worked for the City, Taitague did not report racist or discriminatory treatment via the City's formal reporting system. *Id.* ¶ 59. Nor did Taitague ever speak to another City employee to report racism or disparate treatment. *Id.* ¶ 60. Taitague does not believe that Jones, his on-site supervisor, is racist towards Black people. *Id.* ¶ 51. Nor does Taitague believe that Sear is racist or treated him any differently because of his race. *Id.* ¶ 56.

---

[6] In his declaration, Jones stated that his "recommendation was on my training, knowledge of job skill requirements, and observations that Plaintiff continued to show inexperience, lack of knowledge, displayed uncertainty in operating a tractor trailer, and posed a safety risk." ECF No. 28-8, ¶ 9.

Gampierro Rachello was hired in the same position as Taitague in May 2023. *Id.* ¶¶ 75-76. Soon after beginning his employment, Rachello was involved in an accident while driving a City vehicle. *Id.* ¶ 76. Rachello performed no more work for the City following the accident and was terminated during his probationary period. *Id.* ¶¶ 77-78.

### B.     Procedural History

After obtaining a release of jurisdiction from the Connecticut Commission on Human rights and Opportunity and the Equal Employment Opportunity Commission, Torres sued the City in Connecticut Superior Court pursuant to the Connecticut Fair Employment Practice Act (CFEPA), Conn. Gen. Stat. § 46a-60(b)(1), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Compl., ECF No. 1, at 7-10. The City timely removed to federal court on May 15, 2023. *Id.* at 1.[7] The City answered the complaint on June 30, 2023. Answer, ECF No. 18.

After the close of discovery, the City moved for summary judgment on August 28, 2024. Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Mem."), ECF No. 28-1. Taitague responded on September 26, 2024. Mem. of Law in Supp. of Pl.'s Obj. to Def.'s Mot. for Summ. J. ("Pl.'s Mem."), ECF No. 31. The City replied in support of its motion on October 24, 2024. Def.'s Reply to Pl.'s Opp. to Def.'s Mot. for Summ. J. ("Def.'s Reply"), ECF No. 34.

The case was transferred to me on January 6, 2025. ECF No. 35. I heard oral argument on August 5, 2025. ECF No. 37.

---

[7] The Honorable Omar A. Williams, United States District Judge, presided over this action until it was transferred to me on January 6, 2025.

## II. LEGAL STANDARD

A motion for summary judgment must be granted if the record shows no genuine issue as to any material fact, and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48. The moving party may satisfy this burden by pointing out to the district court an absence of evidence to support the non-moving party's case. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.*

When deciding a motion for summary judgment, I may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See*

Fed. R. Civ. P. 56(c); *Pelletier v. Armstrong*, 3:99-cv-1559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007). In reviewing the record, I must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in [his] favor." *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the non-moving party for the issue on which summary judgment is sought, then summary judgment is improper. *See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

### III. <u>DISCUSSION</u>

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The CFEPA includes similar language, providing that an employer shall not "discharge from employment any individual . . . because of such individual's race, color, religious creed, age, sex, gender identity or expression." Conn. Gen. Stat. § 46a-60(b)(1). "Discrimination claims asserted under the CFEPA 'are evaluated under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green* for parallel federal claims under Title VII.'" *Blake v. Recovery Network of Programs, Inc.*, 655 F. Supp. 3d, 49 (D. Conn. 2023) (quoting *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 88 (2d Cir. 2019)); *see also Craine v. Trinity Coll.*, 259 Conn. 625, 637 n.6 (2002) ("We look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both.").

Employment discrimination claims under Title VII are reviewed under the familiar three-step burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). "[A] plaintiff must first establish a *prima facie* case of discrimination by showing that: '(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (quoting *Winstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) and citing to *McDonnell Douglas*, 411 U.S. at 802). Second, if a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the disparate treatment. *McDonnell Douglas*, 411 U.S. at 802; *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981). "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993)).

Third, if the employer satisfies its burden of production, the burden of persuasion shifts back to the plaintiff to prove by a preponderance of the evidence that they suffered intentional discrimination. "To satisfy the third-stage burden under *McDonnell Douglas* and survive summary judgment in a Title VII disparate treatment case, a plaintiff may, but need not, show that the employer's stated reason was false, and merely a pretext for discrimination; a plaintiff may also satisfy this burden by producing other evidence indicating that the employer's adverse action was motivated at least in part by the plaintiff's membership in a protected class." *Bart v. Golub Corp.*, 96 F.4th 566, 576 (2d Cir.), *cert. denied*, 145 S. Ct. 173 (2024).

### A. Prima Facie Case of Discrimination

For purposes of this motion, the City concedes that Taitague, a Black man who was qualified for his position and who was then terminated, has satisfied the first three elements required to establish a *prima facie* case of discrimination. Def.'s Mem. 16. But the City disputes that the circumstances surrounding Taitague's termination give rise to an inference that Taitague suffered discrimination on account of his race. *Id.* at 16-22.

The Supreme Court and the Second Circuit have emphasized repeatedly that the burden of establishing a *prima facie* case of discrimination is "not onerous." *Burdine*, 450 U.S. at 253; *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) (describing the "evidence necessary to satisfy this initial burden as minimal and de minimis") (citation and internal quotation marks omitted). As relevant here, one of the ways that a plaintiff may establish a *prima facie* case of discrimination is by demonstrating that the employer replaced an employee from a protected class with a person outside the terminated employee's protected class. *Littlejohn v. City of New York*, 795 F.3d 297, 312-13 (2d Cir. 2015).

Taitague has introduced evidence that he was replaced by Abel Guzman, who is not Black. ECF No. 28-6, at 24. Although the City contends that the circumstances surrounding Guzman's hiring do not support an inference of discrimination, Def.'s Reply 6-7, I conclude that Taitague has satisfied his minimal burden at this threshold stage and address the City's explanation for hiring Guzman at steps two and three of the *McDonnell Douglas* framework. *See Clawson v. City of Albany Dep't of Fire & Emerg.*, No. 23-482, 2024 WL 1044531, at *1 (2d Cir. Mar. 11, 2024) (summary order) (concluding *prima facie* case satisfied where plaintiff asserted he was replaced by an individual outside his protected class).

### B. The City's Burden of Articulating a Legitimate, Nondiscriminatory Reason for its Employment Actions

As Taitague has established his *prima facie* case of discrimination, the City bears a limited "burden of producing evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason." *St. Mary's*, 509 U.S. at 507 (internal quotation marks omitted). The City submits that it terminated Taitague because "he lacked confidence, continued to make mistakes, was slower than other employees, required more attention, and otherwise failed to perform his work adequately during his probationary employment period." Def.'s Mem. 23. And it has explained that it recruited Guzman, Taitague's non-Black replacement, pursuant to the CBA's requirement that the City hire first from current employees with seniority. Pl.'s L.R. 56(a)2 St. ¶ 25; ECF No. 28-6, at 24.

Taitague does not dispute that the City has satisfied its limited burden at step two of *McDonnell Douglas*. *See* Pl.'s Mem. 6-7. I agree: the City has clearly satisfied its burden of producing evidence from which a jury could conclude its actions were taken for legitimate reasons. *St. Mary's*, 509 U.S at 509.

### C. Taitague's Ultimate Burden of Establishing Discrimination

Because the City has satisfied its burden at step two of *McDonnell Douglas*, Taitague may no longer rely solely on the presumption of discrimination established by his *prima facie* showing. *Burdine*, 450 U.S. at 255-56; *St. Mary's*, 509 U.S. at 510-11. To survive summary judgment, Taitague "must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern v. Trustees of Columbia Univ*., 131 F.3d 305, 312 (2d Cir. 1997). It is well established that a plaintiff can make this showing by relying on

11

circumstantial evidence. *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464-65 (2d Cir.1989) (cautioning that "employers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law") (citation omitted). In attempting to carry their burden of persuasion, a plaintiff may "rely on the evidence constituting the prima facie case." *Norton*, 145 F.3d at 118 (citation and internal quotation marks omitted).

One permitted form of indirect proof of discrimination is evidence suggesting that the employer's stated grounds for termination were false and were instead mere pretext for discrimination. *St. Mary's*, 509 U.S. at 517-19. Alternatively, "[a] plaintiff may support an inference of race discrimination by demonstrating that similarly situated employees of a different race were treated more favorably." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999).

Taitague contends that the City disregarded its termination guidelines for probationary employees, which he says a jury could take as proof that the City's stated grounds for termination were pretextual. Pl.'s Mem. 8-11. He also asserts that he received less favorable treatment than one similarly situated non-Black employee. Pl.'s Mem. 12. The City responds that it did not violate its personnel policies regarding probationary employees, and that even if it had, that would still not support an inference of intentional discrimination. Def.'s Reply 8-9. The City also asserts that Taitague's chosen comparator actually received no more favorable treatment than Taitague. *Id.* at 6-8.

I turn first to Taitague's assertion that the City's grounds for termination were pretextual and that improper discrimination was the true cause for his removal. A plaintiff may demonstrate that their employer's stated grounds for termination were pretextual by

12

introducing evidence that the employer ignored its personnel policies in such a manner that a jury could conclude the deviation is suggestive of discrimination. *Stern*, 131 F.3d at 312-14. In *Stern*, the employer university maintained it had chosen the best candidate for an opening even though it had convened an "atypical" interdepartmental committee composed largely of faculty who did not speak Spanish to hire the director of its Spanish language program. 131 F.3d at 308-13. This deviation from standard practice was relevant because the evidence suggested that the Spanish faculty, who would normally be authorized to choose the program director, strongly preferred the plaintiff, a white man, over the interdepartmental committee's chosen candidate, a Hispanic man. *Id.* at 313. The Second Circuit construed this deviation, together with a university administrator's concession that the university never intended to seriously consider the plaintiff's candidacy, as sufficient evidence from which a jury could infer that the university discriminated on account of the plaintiff's race. *Id.* at 313.

Similarly, an employer's failure to apply its own progressive disciplinary policies could support an inference of pretext where the employee had received only positive performance reviews until the day he was terminated for cause. *Rodrigues v. Conn. Container Corp.*, No. 3:20-cv-294 (JCH), 2022 WL 844610, at *5 (D. Conn. Mar. 22, 2022). But as Judge Hall has aptly observed, "simply deviating from company policy—absent anything more—is not enough." *Almodovar v. Cross Fin. Corp.*, No. 3:20-cv-1179 (JCH), 2022 WL 1810132, at *7 (D. Conn. June 2, 2022); *see also Bunting v. Kellogg's Corp.*, No. 3:14-cv-621-VAB, 2016 WL 5799291, at *6 (D. Conn. Sept. 30, 2016) (observing that "the procedural irregularities must themselves contribute to the implication of discrimination in order for the plaintiff to survive summary judgment").

Taitague focuses largely on the City's failure to issue written evaluations during his probationary period, which he says was required by its personnel policies. Pl.'s Mem. 8-11; Pl.'s Add'l Mat. Facts ¶¶ 1-5, ECF No. 30. He asserts that the personnel policies provided that a probationary employee could be removed only if their poor performance had been recorded with "supportive documentation." Pl.'s Add'l Mat. Facts ¶¶ 5-8, ECF No. 30. The City disputes that the personnel policies applied to Taitague's position, maintaining that no evaluations were necessary and that probationary employees could be terminated at will. Def.'s Reply 8-9. Another Court in this District recently rejected the proposition that the City of New London's failure to provide written evaluations during an employee's probationary period is sufficient evidence to survive summary judgment on a claim of discriminatory termination. *Holeman v. City of New London*, No. 3:23-CV-00631-MPS, 2025 WL 904469, at *7 (D. Conn. Mar. 25, 2025). There, the Court reasoned that, even assuming that the City was indeed required to provide written evaluations, such a procedural irregularity did not satisfy the plaintiff's burden of persuasion without further evidence that the true reason for termination was discriminatory. *Id.*

I agree that, under these circumstances, any failure to provide written evaluations does not itself create a triable issue of discrimination. Unlike in *Stern*, where a jury could have found that the employer departed from its personnel policies because it sought to appoint its preferred candidate of another race, here Taitague has not introduced any admissible evidence that the City terminated him even partially on account of his race. Rather, Taitague concedes that his supervisors observed his difficulty in adjusting to his role and admits that his supervisor discussed these concerns with him on at least one occasion. Pl.'s L.R. 56(a)2 St. ¶¶ 44-45, 82. Indeed, he acknowledges that it was on the basis of these legitimate observations that his

immediate supervisor, Jones, recommended that he not be retained beyond his probationary period. *Id.* ¶ 48. Thus, given these circumstances, any failure to adhere to the City's personnel policies does not suggest that discrimination accounted for the City's decision to terminate Taitague.

Taitague next asserts that a jury could infer from comparing his treatment to that of similarly situated non-Black employees that he was terminated on account of his race. A plaintiff must show they are "similarly situated in all material respects" to the individuals who allegedly received more favorable treatment. *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997). Furthermore, the comparators must be "subject to the same performance evaluation and discipline standards," *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000), and must have engaged in comparable conduct, *Shumway*, 118 F.3d at 64. At oral argument, Taitague identified only one similarly situated City employee outside his protected class whom he asserted received more favorable treatment: Gampierro Rachello, who was hired as a Transfer Station Maintainer in the Department of Public Works in 2023. The City agrees that Rachello was similarly situated to Taitague. But like Taitague, Rachello was terminated during his probationary period. Pl.'s L.R. 56(a)2 St. ¶ 78. Rachello was terminated because, less than a month into his probationary period, Rachello damaged his vehicle and injured himself by colliding with a bridge. *Id.* ¶¶ 76-78. Rachello performed no work for the City after this accident. So even though Rachello was similarly situated to Taitague in that both were probationary employees, the record reveals that Rachello and Taitague were both

15

terminated because of their performance.[8] Taitague has not introduced any other evidence to support his conclusory assertion that Rachello received more favorable treatment. I therefore find that no jury could rationally conclude from this account of Rachello's treatment that Taitague was terminated on account of his race.

Taitague's remaining evidence similarly fails to undermine the City's legitimate, nondiscriminatory explanation for Taitague's termination.[9] Taitague concedes that a successful driver must demonstrate confidence operating heavy trucks. Pl.'s L.R. 56(a)2 St. ¶ 8. He admits having a conversation with his immediate supervisor, Jones, during which Jones relayed his concern that Taitague lacked this necessary skill. *Id.* ¶ 82. And Taitague agrees that this same concern led Jones to recommend that Taitague not be hired for a permanent position. *Id.* ¶ 48. There is no evidence that the City ever shifted its explanation for why it was terminating Taitague during his probationary period. Taitague's performance was invoked as

---

[8] In his deposition, Taitague speculated that Rachello received more favorable treatment because it was rumored that (1) Rachello had been in several accidents before he was removed and (2) even after his most serious accident where he crashed a City truck into a railroad bridge, Rachello had been offered a transfer to work in another division of the Department of Public Works. ECF No. 28-3, at 14-16. This does not create an issue of material fact because Taitague has not introduced admissible evidence of Rachello's performance. *Id.* at 15 (Taitague stating that he learned about Rachello's accident from "people talking"). As Taitague is not qualified to testify regarding the details of Rachello's employment, I am bound to accept the City's account that Rachello "performed no work for the City following the accident" and was terminated during his probationary period. Pl.'s L.R. 56(a)2 St. ¶¶ 77-78.

[9] Taitague asserts briefly that the City's anti-discrimination policies lower his burden of proving discrimination. Pl.'s Mem. 11-13. In support, he cites to *Marini v. Costco Wholesale Corp.*, 64 F. Supp. 3d 317, 328 (D. Conn. 2014). But *Marini* does not stand for the proposition that an employee has a lower burden of proof in bringing a Title VII claim against an employer with an anti-discrimination policy. Instead, the Court in *Marini* concluded that the employer's progressive disciplinary policies could be invoked in a claim for breach of contract. *Id.* at 327-31. As Taitague has not sued the City for breach of contract, I do not find *Marini* (or indeed the presence of anti-discrimination policies) to be relevant to the question of whether Taitague has carried his burden of establishing that he was terminated on account of his race.

the cause for his termination during a meeting with his supervisors. *Id.* ¶ 54. And the concern about his performance was reiterated in his termination notice. *Id.* ¶ 57.

Nor does the fact that Taitague was replaced by a non-Black employee create a triable issue of discrimination. The City has explained that Taitague's replacement, Guzman, was recruited pursuant to the CBA's requirement to hire first from City employees with seniority. ECF No. 28-6, at 24; Pl.'s L.R. 56(a)2 St. ¶ 25. Taitague has not introduced any evidence that would suggest otherwise. As a result, even though evidence of Taitague's replacement by Guzman is sufficient to support a *prima facie* case, it does not suffice to create a triable issue of discrimination. *See Holeman*, 2025 WL 904469, at *7 (holding that evidence that an employee was replaced by someone outside their protected class is not sufficient to carry the ultimate burden of persuasion that a plaintiff was terminated on account of their race).

Even as I have concluded that no individual piece of evidence submitted by Taitague is sufficient to create a triable issue of discrimination, I still must "examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001). For example, another Court in this District recently denied summary judgment because, even absent "smoking-gun" evidence of discrimination, a jury could construe from the record as a whole that the plaintiff was terminated on account of her race. *See Almodovar*, 2022 WL 1810132, at *12. In *Almodovar*, although the record showed that the employer deviated from its personnel policies by failing to discuss the employee's asserted performance issues before her termination, the employee never explained how that deviation suggested racial discrimination. *Id.* at *8. And though there was evidence that the non-white employee plaintiff was treated less favorably than one white employee, the Court

17

held that this evidence of disparate treatment as to one comparator, standing alone, was insufficient to survive summary judgment. *Id.* at *10. Nonetheless, the Court found that, considered as a whole, a jury could rationally find from the disputed evidence of the employee's performance, the differential treatment the employee faced, and the fact that the employee was never given an opportunity to improve her performance that she was terminated on account of her race. *Id.* at *12.

No similar inference is available here. Unlike in *Almodovar*, Taitague has not introduced any evidence to dispute the City's account that the City terminated him after concluding that his performance was unsatisfactory. Although the plaintiff in *Almodovar* received no opportunity to improve her performance, Taitague acknowledges speaking with his supervisor about his lack of confidence operating heavy trucks. Nor has Taitague identified even one comparator who received more favorable treatment. I therefore conclude that the record, considered as a whole and taking all reasonable inferences in favor of Taitague, would not permit a reasonable jury to conclude that Taitague has satisfied his ultimate burden of proving he was more likely than not terminated on account of his race.[10]

---

[10] The City also asserts that the "same-actor inference" makes Taitague's claim of discrimination particularly implausible. Def.'s Mem. 18-19, 24-25. According to the City, the fact that the same two Black employees, Jones and Collins, participated in hiring and firing Taitague in a short period of time raises a presumption *against* discrimination. *Id.* at 18. But as the City has articulated a convincing and largely unrebutted account of the nondiscriminatory reasons for Taitague's termination, I need not address the merits of this argument. *See Buon v. Spindler*, 65 F.4th 64, 84 (2d Cir. 2023) ("As an initial matter, we have not determined whether the same-actor inference, which we have applied in the context of age discrimination claims under the ADEA, should also apply to claims under Title VII.").

## IV.    CONCLUSION

For the reasons stated above, the Defendant City of New London's Motion for Summary Judgment is GRANTED. The Clerk is respectfully directed to enter judgment in favor of Defendant and close the case.

**SO ORDERED.**

New Haven, Connecticut
August 12, 2025

                                              /s/*Sarah F. Russell*
                                              SARAH F. RUSSELL
                                              United States District Judge